IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | | |
|---|---|---|
| ADOLFO HERNANDEZ, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Case No. 3:23-CV-2429-MAB[1] |
| | ) | |
| ASHINI DESAI, BOBBY BLUM, and | ) | |
| BRIANNA SANDERS, | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM AND ORDER

**BEATTY, Magistrate Judge:**

Plaintiff Adolfo Hernandez injured his hand in June 2022 while incarcerated at Pinckneyville Correctional Center. An x-ray was taken that day, but he waited two weeks for the results, which showed that two of his knuckles were broken. He then had to wait another week to see an orthopedist and get a splint. Plaintiff filed this lawsuit in July 2023 pursuant to 42 U.S.C. § 1983, alleging that he was denied medical treatment for his broken hand in violation of his constitutional rights (Doc. 1). Following a threshold review of the amended complaint, Plaintiff was permitted to proceed on Eighth Amendment deliberate indifference claims against Nurse Briana Sanders, Nurse Practitioner Bobby Blum, and Physician Assistant Ashini Desai based on their alleged failure to provide Plaintiff with adequate medical care (Doc. 9).

---

[1] This case was assigned to the undersigned to conduct all proceedings upon consent of the parties pursuant to 28 U.S.C. §636(c) (*see* Doc. 42).

This matter is currently before the Court on the cross motions for summary judgment filed by Plaintiff and Defendants (Docs. 70, 72). For the reasons explained below, both motions are denied.

## THE BRIEFING

Plaintiff filed his motion for summary judgment on June 20, 2025 (Doc. 70). Defendants then filed theirs about two weeks later, on July 3, 2025 (Doc. 72; *see also* Docs. 73, 74). Plaintiff filed two briefs in response to Defendants' motion on July 18, 2025 and July 21, 2025, respectively (Docs. 77, 78). Defendants filed their response to Plaintiff's motion on July 21, 2025 (Doc. 79). The Court then struck Plaintiff's two response briefs and gave him an opportunity to file an amended response. (Doc. 80). Plaintiff filed an amended response on August 15, 2025 (Doc. 81), and another on August 28, 2025 (Doc. 83). Neither side filed a reply brief.

The Court turns first to Plaintiff's multiple response briefs in opposition to Defendants' motion for summary judgment (Docs. 81, 83). The briefs appear to be completely duplicative of one another time, with the minor and irrelevant exception of a one-page letter to the Court regarding his location included with the first response and a "Civil Cover Sheet" included with the second response (Doc. 81, p. 1; Doc. 83, p. 56). Consequently, the second brief shall be stricken as duplicative.

The Court turns next to Plaintiff's motion for summary judgment, which Defendants contend is deficient (Doc. 79). Defendants point out that Plaintiff's motion does not contain a "Statement of Material Facts," as required by Local Rule 56.1(a) (Doc. 79, p. 2 n.2). Rather, Plaintiff sets forth his facts in a "Declaration" (*see* Doc. 70, pp. 2–4),

which Defendants argue does not actually qualify as an unsworn declaration under 28 U.S.C. §1746 because Plaintiff did not certify "under penalty of perjury" that his statements were "true and correct" (Doc. 79, p. 5; *see also* Doc. 70, pp. 2–4, 7). *See* 28 U.S.C. § 1746. Defendants further point out that Plaintiff's stated facts do not contain specific citations to the record, as required by Federal Rule of Civil Procedure 56 and Local Rule 56.1(a) (Doc. 79, p. 4; *see also* Doc. 70, pp. 2–4). Defendants argue that Plaintiff's motion should be denied due these deficiencies and his failure to put forth evidence to support his motion (Doc. 79, pp. 4, 5–6).

After reviewing all of the parties' briefing, the Court is unpersuaded that Plaintiff's *pro se* motion for summary judgment should be summarily denied as a result of the technical deficiencies. The deficiencies, under the particular circumstances here, are not what the Court would consider to be significant. First, many of the facts asserted by Plaintiff in his motion are not in dispute; Defendants asserted the very same facts in their own motion (*compare* Doc. 70, pp. 2–4 *with* Doc. 73, pp. 3–19). Second, the facts asserted by Plaintiff in his motion are replicated in the properly subscribed Declaration that he included in his response in opposition to Defendants' motion for summary judgment (*compare* Doc. 70, pp. 2–4 *with* Doc. 81, pp. 8–10). Third, the facts asserted by Plaintiff in his motion essentially track the relevant portions of the medical records and/or Plaintiff's testimony from his sworn deposition, both of which Defendants provided to the Court and are relatively brief (*see* Doc. 73, pp. 44–70 (Pl. depo.); *Id.* at pp. 77–119, 159–73, 246

(relevant medical records)). [2] Finally, the bulk of Plaintiff's factual assertions are statements based upon his own personal knowledge and the deficiency could easily be cured by permitting him to make a supplemental filing.

This is simply not an instance in which the Court is being unfairly or unreasonably asked to scour the record for evidence supporting Plaintiff's assertions, like Defendants contend (Doc. 79, p. 4). The evidence is readily available. Furthermore, as best the Court can tell, the technical deficiencies in Plaintiff's motion did not in any way hinder Defendants' ability to respond to it. As already stated, the salient facts are essentially undisputed and both parties relied on the same arguments in their offensive and defensive briefing (*see* Docs. 70, 81; *see* Docs. 73, 79). That means the Court is simply being asked to consider the same facts and the same arguments from two different perspectives and decide if either party is entitled to judgment as a matter of law in their favor. The Court is fully able to give Plaintiff a full review of the merits of his motion notwithstanding the technical deficiencies and without putting forth any extra effort due to those technical deficiencies. Consequently, the Court declines Defendants' request to strike Plaintiff's motion for summary judgment and will consider Plaintiff's motion on the merits.

---

[2] Defendants submitted approximately 200 pages of medical records (Doc. 73, pp. 71–275). Approximately three dozen of those pages are blank (*see id.*). Only about 60 of the remaining 160-plus pages are actually relevant to the medical issue at hand (*see id.*).

### FACTS

The facts summarized here are undisputed when noted.[3] Plaintiff was in a physical altercation on the morning of June 28, 2022, in the chow hall, and injured his right hand after striking another inmate with his fist (undisputed; *see* Doc. 73, pp. 47, 48). Plaintiff was taken to the Health Care Unit, where he was seen by Nurse Briana Sanders (undisputed; *see id.* at pp. 41–43), around 8:55 a.m. (*see id.*, pp. 42, 43, 47).[4] Nurse Sanders filled out an Offender Injury Report (undisputed; *see id.* at pp. 41–43). She recorded Plaintiff's vital signs, his breathing sounds, and that he was alert and oriented (*Id.*). In the "Evaluation of Injury" section, Sanders wrote "[Right] 4th knuckle swollen" (*Id.* at p. 42). She did not record any other objective observations or subjective complaints from Plaintiff (*see id.* at pp. 41–43). The medical records show that Nurse Sanders did not contact the on-duty medical provider or provide Plaintiff with any treatment, such as pain medication, ice, or a wrap for his hand (*see id.*). She instructed him to return to nurse sick call as needed (undisputed; *see id.* at p. 42).

According to Sanders, Plaintiff did not report any pain or discomfort because, if he had, she would have documented it (Doc. 73, p. 37, para. 14, 15 (Sanders Declaration)). Sanders observed that the fourth knuckle on Plaintiff's right hand was swollen but she

---

[3] The Court notes when facts are undisputed but, for the sake of efficiency, does not include a citation to the parties' briefs regarding each fact. (Plaintiff's briefs are located at Docs. 70, 81 and Defendants' briefs are located at Docs. 73, 79.) The Court does, however, include a citation to the evidence that supports each fact.

[4] One page of the Offender Injury Report filled out by Sanders, indicates that Plaintiff was seen at 8:55 p.m. (Doc. 73, p. 42), and another page indicates that it was 8:55 a.m. (*Id.* at p. 43). Plaintiff testified that the altercation occurred in the morning (Doc. 73, p. 47).

did not observe or suspect a fracture, dislocation, or deformity (*Id.* at p. 38, para. 20, 21). She states that she did not observe any signs of pain or distress such as grimacing, guarding the injured body part, rocking, rubbing the area, or moaning because, if she had, she would have documented it (*Id.* at p. 38, para. 18, 19). In Sanders's medical judgment, Plaintiff's condition was not emergent (*Id.* at pp. 38–39, para. 28, 29).

Plaintiff contends that he told Sanders that his hand hurt and it was swollen and bruised (Doc. 73, pp.  49, 50 (Pl. depo)). Plaintiff testified that Sanders examined him "poorly" (*Id.* at p. 49). His said that his hands were handcuffed behind his back the entire time, Sanders was standing in front of him, and she just "kind of like bent and looked" at his hand behind his back (*Id.* p. 50).

After being seen by Sanders, a correctional officer escorted Plaintiff from the health care unit to segregation (undisputed; *see* Doc. 73, pp. 50, 51 (Pl. depo)). Plaintiff testified that when the officer went to take off the handcuffs, he saw how swollen and bruised Plaintiff's hand was (*Id.* at pp. 51, 52). It is undisputed that the officer immediately took Plaintiff back to the Health Care Unit for an x-ray (undisputed; *see id.* at pp. 51, 52). The medical records indicate that the x-ray was completed in-house at Pinckneyville by 12:15 p.m. (undisputed; *Id.* at pp. 77, 246). After the x-ray, Plaintiff was escorted back to segregation (undisputed; *see id.* at p. 52).

The next day, on June 29, 2022, Plaintiff completed an Individual in Custody Request (hereinafter "a kite") directed to the Health Care Unit, stating, "I'm having pain in my right hand. My bone may be broken and it's very bruise[d] and swollen" (undisputed; *see* Doc. 73, p. 82). Two days later, on July 1st, Plaintiff saw a Nurse and

reported that his hand "has been messed up" for a week and he had not had any treatment for it (undisputed; *see id.* at p. 81). The nurse charted that Plaintiff's hand was "severely swollen," his knuckles were "red and bruised," and "one knuckle seemed misplaced." (undisputed; *see id.*). The nurse also wrote that swelling was limiting Plaintiff's range of motion, and he could not form a fist (undisputed; *see id.*). Plaintiff testified that the nurse wrapped his hand with ACE wrap and gave him a blister pack of ibuprofen (undisputed; *see id.* at p. 55).[5] The nurse also reported Plaintiff's condition to the Physician Assistant on duty (undisputed; *see id.* at p. 81).

PA Ashini Desai saw Plaintiff later that same day (undisputed; *see* Doc. 73, p. 78). Desai wrote in Plaintiff's chart that an x-ray was taken on June 28, 2022, but they were still awaiting the results (undisputed; *Id.*). Desai charted that Plaintiff's right hand was severely swollen with discoloration across all knuckles, the palm, and back of his hand, and that swelling limited his range of motion of his fingers (undisputed; *see id.* at pp. 29, 78). He had tenderness to palpation from his fingers to his palm, but no issues at his wrist, no erythema (redness of the skin), and no open wounds (undisputed; *see id.*). He was neurovascularly intact in all fingers, meaning that the nerves and blood vessels in his fingers were functionally normal and without compromise (undisputed; *see id.*). PA Desai's plan was to review the x-ray results when they were received and have Plaintiff return for a follow-up in the clinic (undisputed; *see id.*). In the meantime, she prescribed

---

[5] The fact that the nurse wrapped Plaintiff's hand and gave him ibuprofen is not documented in the medical record submitted to the Court (*see* Doc. 73, pp. 71–275).

Plaintiff 800mg of ibuprofen twice a day for thirty days, told him to ice his hand as needed for one week, and recommended that he continue to wrap his hand until he was seen in the health care unit after his x-ray results were received (undisputed; *see id.*).

PA Desai attested that Plaintiff's condition required an x-ray, but that had already been done (Doc. 73, p. 30 (Desai Decl.)). She believed, in her medical judgment, Plaintiff's condition did not warrant sending him to the emergency room because he did not have an open fracture, open wounds, neurovascular compromise, or infection, and any fracture he did have was stable with minimal or no displacement (*Id.* at p. 29). She believed that his condition could be managed at Pinckneyville by immobilizing his hand with Coban tape or ACE wrap, pain medication, and ice as needed until his x-ray results were received and reviewed, and he was reassessed (*Id.*).

According to Plaintiff, Desai unwrapped his hand and immediately stated that his hand was obviously broken (Doc. 73, p. 56 (Pl. depo)). Desai told him that his hand needed to be x-rayed, and he stated that had already been done (*Id.*). She then told him that she needed to see the x-ray results and wrapped his hand back up (*Id.* at pp. 56, 57).

Four days went by and on July 5th, Plaintiff sent a kite to health care stating that his "right hand knuckle bone [is] hurting really bad" and asking for an update on his x-ray results and to see "a[n] outside doctor" (undisputed; *see* Doc. 73, p. 79). The next day, a nurse charted that Plaintiff was requesting his x-ray results, but they were not in yet (undisputed; *see id.* at p. 80).

On July 7th, Plaintiff sent another kite to health care stating that he never received the ice or the ACE wrap that PA Desai ordered (undisputed; *see* Doc. 73, p. 83). A nurse

issued him an ACE wrap that evening (undisputed; *see id.* at p. 74). Plaintiff also testified that he did not receive the pain medication that Desai ordered for "maybe a week or so." (undisputed; *see id.* at pp. 56–57).

Also on July 7th, a radiology report was finally generated for Plaintiff's x-rays (*see* Doc. 73, p. 246). The radiologist reported irregularity of the heads of fourth and fifth metacarpals. (*Id.*). Specifically, the fourth metacarpal had a mildly impacted fracture and the fifth metacarpal had a nondisplaced fracture (*Id.*). In other words, the knuckles at the base of Plaintiff's ring finger and pinky finger were broken (*see id.* at p. 33, para. 11, 12 (Blum Decl.)).[6] The x-ray report contains a notation indicating that a practitioner at Pinckneyville received and reviewed the x-ray report on July 8, 2022, which was a Friday, and that Plaintiff needed to be seen (*Id.* at p. 246).[7] But it took four more days for Plaintiff to be seen and told about the x-ray results and for additional treatment to be ordered (undisputed; *see id.* at p. 90).

In the meantime, on July 9th, Plaintiff sent a kite to health care saying that his

---

[6] Metacarpals are the five bones in the palm of your hand that connect the fingers and thumb to the wrist. CLEVELAND CLINIC, *Metacarpals,* https://my.clevelandclinic.org/health/body/metacarpals-metacarpal-bones (last visited May 10, 2026). The head connects to your finger bones to form your knuckles. *Id.* The neck connects the head to the shaft of the bone. *Id.*

[7] Defendants conspicuously did not offer this information in their Statement of Facts (*see* Doc. 73, pp. 3–19; *see also* Doc. 73, pp. 28–31 (Desai Decl.); *id.* at pp. 32–35 (Blum Decl.); *id.* at pp. 36–40 (Sanders Decl.)). All they did was point out that Plaintiff does not know when his x-ray report came in (Doc. 73, SUMF 81; *see also* Doc. 81, p. 21, para. 81). Despite Defendants' obfuscation, the Court has enough experience with medical records in prisoner cases to know that the initialed note at the bottom of the x-ray report that reads "7/8/22 see pt.", (*see* Doc. 73, p. 246), presumably means that a practitioner at the prison received and reviewed the report on July 8th and asked that Plaintiff be scheduled to be seen. The initials appear to be PA Desai's based on a comparison with other medical records known to be authored or initialed by her (*compare* Doc. 73, p. 246 *with* p. 78, 111, 119, 159, 161,164,167, 168, 171). It must be noted that Plaintiff does not challenge any of PA Desai's actions or omissions following the July 1st examination (*see* Docs. 70, 81). The Court nevertheless finds these events informative and therefore includes the relevant facts.

requests to see a practitioner were going unanswered and he had been in constant pain for eleven days (undisputed; *see* Doc. 73, pp. 85, 91). Plaintiff saw a nurse that same day, who noted they were still waiting on the x-ray report and gave Plaintiff Tylenol (undisputed; *see id.* at p. 84).

On July 10th, Plaintiff sent another kite to health care asking why it was taking so long to get the x-ray results (undisputed; Doc. 73, pp. 88, 94 ("It's been 12 days since they took x-rays. Where are those x-rays[?]")). He saw a nurse again that day (undisputed; *see id.* at p. 86). He described his pain to the nurse as throbbing and constant and rated it as 10/10 (undisputed; *id.*). The nurse noted that Plaintiff winced when his hand was touched and that the x-ray results were still not available for review (undisputed; *see id.*). She referred Plaintiff to see the doctor and gave him a three-day supply of ibuprofen (18 tablets) to take as needed (undisputed; *see id.*).

On July 11th, Plaintiff saw a nurse again (undisputed; *see* Doc. 73, p. 87). She too noted that they were still awaiting the x-ray results, but that Plaintiff had ibuprofen and an ACE wrap and had been referred to a provider (undisputed; *id.*).

Finally, on July 12, 2022, Plaintiff saw NP Bobby Blum and was told that the x-ray showed he had two fractured knuckles (undisputed; *see* Doc. 73, p. 90 (medical records); *id.* at p. 63 (Pl. depo); *id.* at p. 33 (Blum Decl.)). Blum charted that Plaintiff's right fingers and hand were swollen with tenderness to palpation, but he had a positive capillary refill test and pulse, indicating good blood flow (undisputed; *see id.* at p. 90). Blum submitted an urgent referral for a consultation with an orthopedist (undisputed; *see id.* at pp. 90, 160). Blum told Plaintiff to continue taking the Neurontin and Motrin that had previously

been prescribed (undisputed; *see id.* at p. 90). Blum also told Plaintiff to elevate his right hand above his heart to decrease swelling and to continue using the ACE wrap (undisputed; *see id.*). Blum attested that, in his medical judgment, Plaintiff's condition did not warrant sending him to the emergency room because Plaintiff did not have an open fracture or a displaced fracture, he had no open wounds or neurovascular compromise, and he did not have an infection (*Id.* at p. 34, para. 18). In NP Blum's medical judgment, Plaintiff's injury could be managed at Pinckneyville by immobilizing his right hand with ACE wrap and taking pain medication as needed until he could be seen by an orthopedist (*Id.* at para. 20, 21).

On July 19th, Plaintiff was seen at the Orthopedic Institute of Southern Illinois (undisputed; *see* Doc. 73, pp. 161–63). He described having "constant" pain that he rated as 10/10 (*Id.* at p. 161). By that time, Plaintiff's hand was no longer swollen or bruised, but he still had tenderness along his fourth finger (*Id.* at p. 162). New x-rays were taken that day, which according to the orthopedist showed a mildly impacted, closed, nondisplaced neck fracture of the fourth metacarpal bone (*Id.* at pp. 162, 163). The orthopedist thought the fracture was "routinely healing." (*Id.* at p. 163). He recommended an ulnar gutter splint for four weeks followed by a return visit (*Id.*). He also noted that he thought Plaintiff's subjective complaints of pain would resolve over time (*Id.*).

Later that same day, PA Desai submitted a referral for a follow-up appointment with the orthopedist in four weeks (undisputed; Doc. 73, pp. 164, 167). It appears that the Health Care Unit at Pinckneyville was notified on July 28th that the referral was authorized (*see id.* at pp. 165, 166). The records do not, however, indicate when the follow-

up appointment was made (*see id.* at pp. 71–275). On September 14th, the Health Care Unit received a kite from Plaintiff stating that he was supposed to follow-up with the orthopedist after four weeks but he still had not been seen (undisputed; *see id.* at p. 106). It appears that Plaintiff's appointment with the orthopedist was supposed to be the next day on September 15th but Plaintiff was sent to the wrong office (*see id.* at pp. 105, 107 (medical records); *see also id.* at p. 64 (Pl. depo)). NP Blum wrote that Plaintiff needed to follow up with the orthopedist "ASAP" (undisputed; *see id.* at p. 105). Plaintiff saw Blum again on September 29th and asked when he was going to the orthopedist (*Id.* at p. 107). Blum charted that he verified with "staff assistant/scheduling" that Plaintiff had an appointment with orthopedics (undisputed; *see id.*).

Plaintiff had his follow-up appointment with the orthopedist on October 10th, nearly two months beyond the recommended follow-up date (undisputed; *see also* Doc. 73, pp. 168–171). X-rays taken that day showed "a completely healed fourth metacarpal neck fracture in anatomic alignment" (*Id.* at p. 170). However, the musculature in his fourth and fifth fingers was atrophied and while he was able to fully extend the fingers, he had "very limited motion" when he tried to bend them (undisputed; *see also id.*). The orthopedist ordered physical therapy to help improve Plaintiff's range of motion in his fingers (undisputed; *see also id.* at pp. 168, 171).

Plaintiff saw PA Desai when he returned from the orthopedist, and she ordered physical therapy (undisputed; *see also* Doc. 73, pp. 111, 171). Plaintiff had physical therapy from October 26, 2022, to January 6, 2023 (undisputed; *see also id.* at pp. 112–119, 172–73). The physical therapy discharge note from January 6, 2023, states that Plaintiff's fingers

had "normal appearance" and he had achieved range of motion and strength within functional limits (undisputed; *see also id.* at p. 173).

## LEGAL STANDARD

Summary judgment is appropriate when there is no genuine dispute of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). In deciding a motion for summary judgment, the court must view all the evidence in the record in the light most favorable to the non-moving party and draw all reasonable inferences in their favor. *Stewart v. Wexford Health Sources, Inc.*, 14 F.4th 757, 760 (7th Cir. 2021); *Hansen v. Fincantieri Marine Grp., LLC*, 763 F.3d 832, 836 (7th Cir. 2014). Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial'" and summary judgment is warranted. *Armato v. Grounds*, 766 F.3d 713, 719 (7th Cir. 2014) (citation omitted). *See also Maniscalco v. Simon*, 712 F.3d 1139, 1143 (7th Cir. 2013) ("Factual disputes are genuine only if there is sufficient evidence for a reasonable jury to return a verdict in favor of the non-moving party on the evidence presented, and they are material only if their resolution might change the suit's outcome under the governing law.") (citation and internal quotation marks omitted).

On cross-motions for summary judgment, the standard remains unchanged. *Blow v. Bijora, Inc.*, 855 F.3d 793, 797 (7th Cir. 2017). As the court evaluates each side's motion, the court simply "construes all facts and inferences arising from them in favor of the party against whom the motion under consideration is made." *Id.* (citation omitted).

## DISCUSSION

To prevail on an Eighth Amendment claim for inadequate medical care, a plaintiff

must prove that prison officials acted with "subjective deliberate indifference" to his "objectively serious" medical condition. *E.g., Reck v. Wexford Health Sources, Inc.*, 27 F.4th 473, 483 (7th Cir. 2022). For the purposes of summary judgment, Defendants do not dispute that Plaintiff's broken knuckles were an objectively serious medical condition (*see* Doc. 73). Therefore, the only question for the Court is whether the evidence establishes an issue of fact as to whether Defendants acted with deliberate indifference.

Deliberate indifference requires the plaintiff to show that the prison official "*actually* knew of and disregarded a substantial risk of harm." *Petties v. Carter*, 836 F.3d 722, 728 (7th Cir. 2016) (en banc) (citing *Farmer v. Brennan*, 511 U.S. 825, 837 (1994)). "This is a high bar 'because it requires a showing [of] something approaching a total unconcern for the prisoner's welfare in the face of serious risks.'" *Rasho v. Jeffreys*, 22 F.4th 703, 710 (7th Cir. 2022) (quoting *Rosario v. Brawn*, 670 F.3d 816, 821 (7th Cir. 2012)). "Mere medical malpractice or a disagreement with a doctor's medical judgment is not deliberate indifference." *Edwards v. Snyder*, 478 F.3d 827, 831 (7th Cir. 2007) (citations omitted). *Accord Petties*, 836 F.3d at 728 ("[N]egligence is not enough.").

When it comes to medical professionals, "[t]here is not one 'proper' way to practice medicine in prison, but rather a range of acceptable courses based on prevailing standards in the field." *Holloway v. Delaware Cty. Sheriff*, 700 F.3d 1063, 1073 (7th Cir. 2012) (citation omitted). For that reason, a medical professional's treatment decision is entitled to deference so long as the decision was based on professional judgment, meaning it was "fact-based with respect to the particular inmate, the severity and stage of his condition, the likelihood and imminence of further harm and the efficacy of available

Page 14 of 25

treatments." *Roe v. Elyea*, 631 F.3d 843, 857, 859 (7th Cir. 2011). *See also Perez v. Fenoglio*, 792 F.3d 768, 777 (7th Cir. 2015) ("Prison officials must provide inmates with medical care that is adequate in light of the severity of the condition and professional norms.").

> [A] treatment decision that's based on professional judgment . . . implies a choice of what the defendant believed to be the best course of treatment. A doctor who claims to have exercised professional judgment is effectively asserting that he lacked a sufficiently culpable mental state, and if no reasonable jury could discredit that claim, the doctor is entitled to summary judgment.

*Zaya v. Sood*, 836 F.3d 800, 805 (7th Cir. 2016).

"But deference does *not* mean that a defendant automatically escapes liability any time he invokes professional judgment as the basis for a treatment decision." *Zaya*, 836 F.3d at 805 (emphasis in original). There are a variety of circumstances from which a jury can reasonably infer that a medical professional did not exercise professional judgment and instead acted with deliberate indifference. *Brown v. Osmundson*, 38 F.4th 545, 550 (7th Cir. 2022). Those circumstances include the denial of medical treatment altogether;[8] a treatment decision that is "blatantly inappropriate" even to a layperson;[9] a treatment decision that is "a substantial departure from accepted professional judgment, practice,

---

[8] *Brown*, 38 F.4th at 550 (citing *Petties*, 836 F.3d at 729).

[9] *Pyles v. Fahim*, 771 F.3d 403, 409 (7th Cir. 2014); *see also Petties*, 836 F.3d at 729 (a jury can infer deliberate indifference when "a risk from a particular course of medical treatment (or lack thereof) is obvious.").

Page 15 of 25

or standards";[10] continuing an ineffective course of treatment;[11] and an inexplicable delay in providing medical care.[12]

When it comes to delays in providing medical care, the Seventh Circuit has observed that "some delay [is] inevitable" due to the "limited resources" that correctional facilities have. *Zemlick v. Burkhart*, 164 F.4th 1004, 1014 (7th Cir. 2026) (quoting *Mitchell v. Kallas*, 895 F.3d 492, 500 (7th Cir. 2018)). But an inexplicable delay that serves no penological purpose and exacerbates the inmate's injury or unnecessarily prolongs his pain may constitute deliberate indifference. *Lewis v. McLean*, 864 F.3d 556, 563 (7th Cir. 2017); *Petties*, 836 F.3d at 731. "[T]he length of delay that is tolerable depends on the seriousness of the condition and the ease of providing treatment." *McGowan v. Hulick,* 612 F.3d 636, 640 (7th Cir. 2010). The delay in providing treatment is only actionable under the Eighth Amendment if the plaintiff can provide independent evidence that the delay—rather than the inmate's underlying condition—caused some degree of harm. *Petties*, 836 F.3d at 730–31; *see also Williams v. Liefer*, 491 F.3d 710, 714–15 (7th Cir. 2007).

### A. Nurse Briana Sanders

The Court looks first to Defendants' motion for summary judgment, which

---

[10] *Petties*, 836 F.3d at 729. *See also Pyles*, 771 F.3d at 409 ("A medical professional is entitled to deference in treatment decisions unless 'no minimally competent professional would have so responded under those circumstances'"); *Norfleet v. Webster*, 439 F.3d 392, 396 (7th Cir. 2006) ("[T]he decision must be so far afield of accepted professional standards as to raise the inference that it was not actually based on a medical judgment.").

[11] *Brown*, 38 F.4th at 550 (citing *Conley v. Birch*, 796 F.3d 742, 747 (7th Cir. 2015)).

[12] *Goodlow v. Sood*, 947 F.3d 1026, 1031 (7th Cir. 2020) (citing *Petties*, 836 F.3d at 731). *See also Grieveson v. Anderson*, 538 F.3d 763, 779 (7th Cir. 2008) ("A delay in the provision of medical treatment for painful conditions—even non-life-threatening conditions—can support a deliberate-indifference claim.")

requires looking at the evidence in the light most favorable to Plaintiff. Plaintiff contends that Nurse Sanders was deliberately indifferent because she failed to conduct a proper examination and failed to provide him with any medical treatment whatsoever (*e.g.*, Doc. 81, p. 2). The Court has little trouble concluding that a reasonable jury could agree.

According to Plaintiff, Sanders knew that he was in pain because he told her. There is evidence that she did not examine Plaintiff's hand in any meaningful way but rather took only a cursory look at his hand while it was behind his back and still in handcuffs. There are no notes demonstrating that she did any kind of examination of Plaintiff's hand to test his range of motion, tenderness on palpation, capillary refill, etc., like other nurses did (*see* Doc. 73, pp. 41–43; *see also* Doc. 73, p. 81 (nurse's note re: Plaintiff's range of motion), *id.* at p. 80 (nurse's note re: palpation of hand); *id.* at p. 87 (nurse's note re: capillary refill and circulation)).

While Sanders claims that, in her medical judgment, Plaintiff's condition was not emergent and did not require notifying the on-site medical practitioner, a jury could certainly discredit this contention, given that shortly after Plaintiff left his visit with Sanders, a correctional officer who saw Plaintiff's hand thought he was in obvious need of an x-ray and took him back to the Health Care Unit. A jury could certainly reason that Nurse Sanders would have thought so too had she simply taken a look at his hand.

Furthermore, Nurse Sanders did not refer Plaintiff to a physician, did not give him any over-the-counter pain medication, like other nurses did, and did not offer him ice. She did not offer him any advice, like to elevate his hand. She just told him to put in for nurse sick call as needed and sent him to his cell. In short, she did almost nothing and on

this record, a reasonable jury could conclude that Nurse Sanders exhibited "total unconcern" for Plaintiff's welfare by failing to treat and/or delaying the treatment of his painfully injured hand.

The Court must now consider the issue from the other perspective, looking at the evidence in the light most favorable to Nurse Sanders. The Court finds that a reasonable jury could find in Nurse Sanders' favor, that she was *not* deliberately indifferent to Plaintiff's hand injury. The jury could believe that her examination was not cursory; after all, she took Plaintiff's temperature, pulse, respiratory rate, and blood pressure, assessed his mental status, and made notes about his breathing sounds (*see* Doc. 73, pp. 41–43). They could also believe that she did not observe any objective signs of pain or distress (Doc. 73, p. 38, para. 18), and that she did not suspect Plaintiff had a fracture (*Id.* at p. 21). Or they could conclude that she did not have the requisite state of mind, and she was simply negligent in her assessment that Plaintiff did not require any medical diagnosis or treatment.

In sum, the evidence on Plaintiff's claim against Nurse Sanders comes down to, in large part, a he-said-she-said. The Court cannot decide who to believe, and a jury could reasonably believe either of them. Therefore, neither one is entitled to summary judgment.

## B. PA Ashini Desai

The Court looks first to Defendants' motion for summary judgment, which requires looking at the evidence in the light most favorable to Plaintiff. The Court concludes that a reasonable jury could find that PA Desai was deliberately indifferent to

Plaintiff's hand injury.

The facts of this case bear close resemblance to the facts of *Conley v. Birch*, 796 F.3d 742 (7th Cir. 2025). In *Conley*, the prisoner broke his hand in a physical altercation with another inmate. 796 F.3d at 744. On Christmas Eve, he went to the healthcare unit for his pain. *Id*. The nurse noted the prisoner's hand was "severely" swollen, with bruising on all fingers, thumb, and palm, and limited range of motion; the nurse wrote "possible/probable fracture." *Id.* The nurse called the physician assigned to the facility, and after speaking with the physician, gave the prisoner an ice pack and some ibuprofen. *Id*. at 745. The doctor returned to work from the holidays five days later and examined the prisoner. *Id*. She then ordered an x-ray, which ultimately revealed a fracture. *Id*. The prisoner sued over the delays in providing medical care. *Id*.

The Seventh Circuit held that a reasonable jury could find that the doctor was aware of the prisoner's objectively serious medical condition. *Conley*, 796 F.3d at 747. The court explained that the treatment notes—which documented severe swelling, discoloration, loss of function and mobility to all four fingers and thumb, and the nurse's description of a possible or probable fracture—"suggest[ed] a serious injury." *Id.* Assuming that the nurse relayed the fully extent of his observations to the doctor during their phone call, which was the nurse's standard practice, then the doctor was given information sufficient to lead her to "strongly suspect" that the prisoner had suffered a fracture. *Id.* The Seventh Circuit explained that whether the doctor actually made that inference was a question for trial. *Id.*

The court ultimately held that a reasonable jury could also conclude that the doctor

knowingly disregarded the prisoner's objectively serious medical condition when he was given only pain medication and ice for a suspected fractured hand and the doctor "refus[ed] either to promptly evaluate [the prisoner's] condition (by ordering an x-ray or performing an in-person exam) or to provide appropriate precautionary treatment (by immobilizing his hand)." *Conley*, 796 F.3d at 747.

Here, like *Conley*, PA Desai's notes suggest a serious injury. Plaintiff's hand was "severely" swollen three days after his injury occurred, and he had extensive bruising, limited range of motion, and pain when the area was touched. Given these objective signs, a jury could reasonably conclude that PA Desai knew there was a serious risk that Plaintiff's hand was fractured. *See Norfleet v. Webster*, 439 F.3d 392, 396 (7th Cir. 2006) ("[A] factfinder may conclude that a prison official knew of a substantial risk from the very fact that the risk was obvious.") (citations omitted). In fact, Plaintiff claims that Desai said as much.

The question thus becomes whether a reasonable jury could conclude that Desai was deliberately indifferent to Plaintiff's injury. Just like the physician in *Conley*, Desai did not completely ignore Plaintiff; she gave him ice, ibuprofen, and an ACE wrap. But the provision of *some* medical care "does not automatically defeat a claim of deliberate indifference." *Peterson v. Wexford Health Sources, Inc.*, 986 F.3d 746, 752 (7th Cir. 2021) (quoting *Perez v. Fenoglio*, 792 F.3d 768, 777 (7th Cir. 2015)). It is possible for a plaintiff to demonstrate a medical provider was deliberately indifferent even though they provided some minimal treatment. *See Conley*, 796 F.3d at 747. The Court concludes that, just like in *Conley,* a jury here could reasonably conclude that given PA Desai's suspicion that

Plaintiff's hand was broken, she did not do enough for Plaintiff, and her inaction substantially and unreasonably delayed necessary treatment.

Generally speaking, a lay person knows, even without expert testimony, that prompt diagnostic imaging and immobilization with a cast or splint is generally the standard treatment for a suspected broken bone. By the time Desai saw Plaintiff on July 1, 2022, it had already been three days since Plaintiff's x-rays were taken, but the results were still not back. Desai was apparently unwilling to provide any medical care beyond ice, ibuprofen, and a soft wrap, such as a referral to an orthopedist, unless and until it was confirmed via x-ray that Plaintiff's hand was indeed broken. But there is no evidence that Desai took any action to check on the status of the x-ray results that day or in the days that followed. And she did not send him out to the hospital for another set of x-rays that would have yielded results that same day. Desai provided no explanation or evidence as to the reason for the delay, nor did she offer any opinion on how long of a delay is acceptable and reasonable. On this record, a reasonable jury could find her inaction inexcusable and that she contributed to the delay in obtaining the diagnostic imaging necessary to confirm that Plaintiff's hand was broken.

There is also a question of whether PA Desai provided appropriate treatment when she only gave Plaintiff a soft wrap to immobilize his hand. Even a lay person understands that soft wraps provide very limited immobilization, and a suspected fracture generally requires a splint or cast in short order, to be properly immobilized. Desai notably did not explain what purpose the soft wrap served or why exactly she thought it was sufficient treatment for Plaintiff's injury (*see* Doc. 73, pp. 28–30). She also

Page 21 of 25

provided no explanation as to why a splint was not provided (*see id.*). Nor is there any evidence to suggest that she provided Plaintiff with any guidance as to whether and how much he could/should move or use his hand or how to effectively wrap his hand (*see id.*; *see also id.* at pp. 71–275). On this record, a reasonable jury could find that PA Desai was deliberately indifferent to Plaintiff's hand injury and therefore PA Desai is not entitled to summary judgment.

The Court must now consider the issue from the other perspective, looking at the evidence in the light most favorable to PA Desai. The Court finds that a reasonable jury could find that PA Desai was *not* deliberately indifferent to Plaintiff's hand injury. A jury could opt to credit Desai's explanation that, in her medical judgment, it was not necessary to send Plaintiff to the emergency room and his condition could be managed at Pinckneyville until his x-ray results were received and reviewed by immobilizing his hand with a soft wrap, pain medication, and ice as needed. That is particularly true because Plaintiff did not put forth any expert evidence that Desai's actions were "a substantial departure from accepted professional judgment, practice, or standards." Plaintiff also did not cite any evidence or testimony that the splint provided by the orthopedist was crucial in alleviating his pain (*see* Doc. 70). For these reasons, Plaintiff is not entitled to summary judgment.

Given that there is evidence pointing in both directions and a reasonable jury could find in favor of either Plaintiff or Desai, neither party is entitled to summary judgment. The question of whether Desai acted with deliberate indifference must be left to the judgment of a jury.

On a final note, PA Desai also contends that, to the extent she was responsible for a delay in medical treatment, there is no evidence that the delay exacerbated Plaintiff's injury or unnecessarily prolonged his pain (Doc. 73, pp. 22–23). The Court is not persuaded. The medical records plainly document that Plaintiff complained multiple times that he was still in severe pain after he saw PA Desai (Doc. 73, pp. 79, 86). And a jury could reasonably infer that a splint (or other proper immobilization) would have alleviated Plaintiff's pain while he waited for the x-ray results or to see a specialist. *See Petties*, 836 F.3d at 732. That is sufficient for a jury to conclude that PA Desai's inaction unnecessarily prolonged Plaintiff's pain. *See Williams*, 491 F.3d at 715 (medical records are sufficient verifying medical evidence for jury to conclude delay in treatment had detrimental effect; expert testimony is not necessary).

### C. NP Bobby Blum

The Court looks first to Defendants' motion for summary judgment, which requires looking at the evidence in the light most favorable to Plaintiff. A reasonable jury could find that NP Blum was deliberately indifferent to Plaintiff's hand injury. By the time Plaintiff saw NP Blum on July 12, 2022, it had been 14 days since Plaintiff injured his hand. Blum definitively knew that Plaintiff's hand was fractured. Blum could see from Plaintiff's chart that he had only been given ice, ibuprofen, and a soft wrap, which did not alleviate his pain; rather, Plaintiff continued to complain of severe pain in spite of those treatments. Yet Blum took no action to immobilize Plaintiff's hand in a split or a cast. Rather, he opted to leave Plaintiff in a soft wrap and refer him to see an orthopedist, which he obviously knew would take several days to occur given that the referral had to

be approved by Wexford's Utilization Management department, (Doc. 73, pp. 33–34), before the appointment could even be scheduled. As with PA Desai, NP Blum failed to provide any explanation as to what purpose the soft wrap served or why exactly it was appropriate treatment for a fracture that was already 14 days old and that was causing Plaintiff severe pain (*see* Doc. 73, pp. 32–35). There is also no evidence that Blum provided Plaintiff with any guidance on how to effectively wrap his hand.

Consequently, a reasonable jury could conclude on this record that NP Blum was deliberately indifferent by continuing to provide the same treatment that was ineffective at addressing Plaintiff's pain and/or unreasonably delaying necessary treatment. Like Desai, Blum argues that there is no evidence that the delay exacerbated Plaintiff's injury or unnecessarily prolonged his pain (Doc. 73, p. 24). Again, the Court is not persuaded for the same reason explained above with respect to PA Desai. Accordingly NP Blum is not entitled to summary judgment.

The Court must now consider the issue from the other perspective, looking at the evidence in the light most favorable to NP Blum. The Court finds that a reasonable jury could find that NP Blum was *not* deliberately indifferent to Plaintiff's hand injury for the same reasons explained above with respect to PA Desai.

Given that there is evidence pointing in both directions and a reasonable jury could find in favor of either Plaintiff or Blum, neither party is entitled to summary judgment. The question of whether Blum acted with deliberate indifference must be left to the judgment of a jury.

## CONCLUSION

Plaintiff's response to Defendant's Motion for Summary Judgment (Doc. 83) is **STRICKEN** as being duplicative of the response filed at Doc. 81.

Plaintiff's Motion for Summary Judgment (Doc. 70) is **DENIED**. Defendants' Motion for Summary Judgment (Doc. 72) is likewise **DENIED**. This matter shall proceed to trial on Plaintiff's Eighth Amendment deliberate indifference claims against Nurse Briana Sanders, NP Bobby Blum, and PA Ashini Desai. A status conference will be set by separate order to discuss trial scheduling and as well as the scheduling of a settlement conference or a referral to mediation.

**IT IS SO ORDERED.**

**DATED: May 13, 2026**

*Mark A. Beatty*

**MARK A. BEATTY**
**United States Magistrate Judge**